# BETTY JEAN WRIGHT *v.* COMMERCIAL AND SAVINGS BANK

[No. 58, September Term, 1982.]

*Decided September 15, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Michael Bowen Mitchell,* with whom were *Michael Waring Lee* and *David B. Allen* on the brief, for appellant.

*Stephen M. Waldron,* with whom was *T. Carroll Brown* on the brief, for appellee.

Cole, J., delivered the opinion of the Court. Murphy, C. J., and Smith and Rodowsky, JJ., dissent. Smith, J., filed a dissenting opinion at page 159 *infra,* in which Murphy, C. J., and Rodowsky, J., concur.

In this case, we must determine whether a depositary bank, at the direction of one co-owner of a joint checking account, may delete the name of another co-owner without that person's permission. The facts giving rise to this issue are as follows.

In 1964, Betty Jean Wright and her husband, Verlon, opened a joint checking account in the name of Level Building Supply at the Commercial and Savings Bank. The signature card for this account indicated that either party could draw on the account with only one signature and that the balance of the account was payable to the survivor. The card did not specify any procedure for removing a co-owner's name from the account.

After marital problems arose and Betty Jean went to Florida, Verlon instructed the bank to remove Betty Jean's name from the account. Although initially suggesting that Mr. Wright "change over to a new account," the bank complied with his request and crossed Betty Jean's name from the signature card, with the notation "removed 6-16-76." The bank did not notify Betty Jean that her name had been removed from the account.

In August of 1976, Betty Jean went to the bank and requested a counter check on the Level Building Supply account in order to withdraw $500.00. Because her name was no longer on the account, a teller refused to give her a check.

Betty Jean sued her husband and the bank in the Circuit Court for Harford County. Counts III and IV of her second amended declaration were directed to the bank, alleging breach of the contract as a result of the bank's removal of her name from the joint checking account. The trial court granted the bank's motion for a directed verdict at the close of the Plaintiff's case; Betty Jean thereupon appealed to the

Court of Special Appeals, which affirmed, *Wright v. Commercial & Sav. Bank,* 51 Md. App. 398, 407, 445 A.2d 30 (1982), concluding that "the right of a joint depositor to withdraw all the funds from a joint account encompasses the right to delete the name of another on a joint account." The intermediate appellate court also noted that Betty Jean had abandoned her wrongful dishonor claim at oral argument. Taking exception to the latter conclusion, she filed a motion for reconsideration pointing out that this issue was raised in her brief and at oral argument. The Court of Special Appeals denied this motion for reconsideration on May 4, 1982. Betty Jean filed a petition for a writ of certiorari posing the basic issue as follows:

> Did the Court of Special Appeals err in holding that a depository bank is not liable for damages resulting from the bank's removal of the name of one co-owner from a joint checking account at the direction of the remaining co-owner without notice to or permission from the former joint owner?

We granted certiorari to consider the question thus raised,[1] which we have separated into the contract and wrongful dishonor issues.

## I

Betty Jean's primary claim is that the bank breached its contract by removing her name from the Level Building Supply account, which she co-owned with her husband. On direct examination, Daniel Fitzpatrick, the bank's executive vice-president, agreed that the written evidence of this contract was the signature card for the account. The face of this card indicated that Verlon and Betty Jean opened an account, titled Level Building Supply, at the Commercial and Savings Bank, Bel Air, Maryland, and that only one signature was required to use the account. The language on

---

1. Mrs. Wright posed other issues which we need not address because of the disposition we make of the basic issue as framed.

the reverse side of the card relevant to this type of account provided:

> We agree and declare that all funds now, or hereafter, deposited in this account are, and shall be, our joint property and owned by us as joint tenants with right of survivorship, and not as tenants in common; and upon the death of either of us any balance in said account shall become the absolute property of the survivor. The entire account or any part thereof may be withdrawn by or upon the order of, either of us or the survivor.

> It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin, legatees, assigns and personal representatives.

> Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto.

Thus, the signature card indicates that the bank and the Wrights entered into a three-party contract. The bank accepted their account and all parties agreed that either of the named depositors could draw on the account. However, nothing contained in this signature card suggests that the bank could strike the name of one of the co-owners from this account, thereby unilaterally terminating that person's right to use the account. While the language indicates that each person assumed the risk that the other might withdraw any or all funds in the account at any given time, it does not suggest that either assumed the bank could remove one of their names from the account without that person's consent.

The bank argues, however, that the signature card alone does not comprise the entire contract between the parties. It contends that the laws dealing with the relationship between banks and their customers and the accepted practices and usages of trade also must be considered as part of the agreement between the parties. When so considered the

bank maintains that it was authorized to delete Mrs. Wright's name from the account. The bank alludes to the Commercial Law and Financial Institutions Articles of the Maryland Code to buttress its point. Our cases make indelibly clear that Maryland adheres to the general rule that parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident. *Design & Funding v. Betz Garage,* 292 Md. 265, 276, 438 A.2d 1316 (1981); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 320, 424 A.2d 744 (1981); *Dennis v. City of Rockville,* 286 Md. 184, 189-90, 406 A.2d 284 (1979); *Beca v. City of Baltimore,* 279 Md. 177, 182, 367 A.2d 478 (1977); *Prince George's Club v. Carr,* 235 Md. 591, 607, 202 A.2d 354 (1964); *Holmes v. Sharretts,* 228 Md. 358, 367, 180 A.2d 302 (1962); *Baltimore v. Employers' Ass'n,* 162 Md. 124, 130-31, 159 A. 267 (1932). However, our examination of these articles discloses nothing supporting the bank's contention that it had authority to delete a co-owner's name from a checking account under the circumstances of this case.

Section 5-303 of the Financial Institutions Article, Md. Code (1980), governing "Joint Accounts," adds nothing to that which is expressly stated on the signature card — that the money in the joint account may be withdrawn by either co-depositor. Title 3 of the Commercial Law Article, "Commercial Paper," governs transactions with negotiable instruments, in this case, a check; however, that provision of the Code does not address the relationship between a bank and its depositor except as those parties might deal with a specific check. Title 4 of the Commercial Law Article covers "Bank Deposits and Collections"; however, not even Subtitle 4, specifying the "Relationship Between Payor Bank and Its Customer," provides a specific resolution of this issue. Thus, we find no applicable statutory provision which is dispositive of the question posited.

We observe, however, that Title 1 of the Commercial Law Article does suggest possible ways in which terms of a

contract may be amplified. Section 1-205 provides in part:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is emobodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and *supplement or qualify terms of an agreement.* [Emphasis supplied.]

Under this provision, a particular course of dealing or usage of trade, if demonstrated, would be sufficient to supplement the terms of the agreement between the parties. Obviously, the party asserting the practice would be required to carry the burden of proof. In this case the bank did not attempt to establish a course of dealing; it did attempt to demonstrate a usage of trade. As such, the bank was required to produce evidence of a practice common to the banking industry rather than proof of a mere routine or usual procedure at the subject bank. *See generally Chesapeake Bank v. Swain,* 29 Md. 483, 501 (1868); *Duvall v. Farmers Bank of Md.,* 9 G. & J. 31, 50 (1837); *T & L Leasing Corp. v. General Elec. Credit Corp.,* 516 F. Supp. 1131, 1134 (E.D. Pa. 1981); *First Federal, Etc. v. Union Bank & Trust,* 291 N.W.2d 282, 286 (S.D. 1980). In the instant case, the only evidence remotely tending to support this contention was offered by the bank

vice-president, Mr. Fitzpatrick, who testified that removing the name from a joint account was not unusual and, in fact, was "normal routine with us." Neither he nor any other witness testified that the procedure had any wider acceptance than at this bank. Thus, the bank produced insufficient testimony to establish a usage of trade modifying the express terms of this contract.

Furthermore, § 1-205 (3) provides that only a usage of trade of which both parties "are or should be aware" may supplement the terms of an agreement. Mrs. Wright's testimony was unequivocal that she was not aware that the bank was authorized to remove her name from the account and the bank offered no proof that she should have been aware. *See generally United States, Etc. v. Haas & Haynie Corp.,* 577 F.2d 568, 573-74 (9th Cir. 1978). We conclude, therefore, there is no authorization in the written contract between the parties, in the law supplementing the contract or in the usual trade practices to justify the bank's removal of Betty Jean Wright's name from this co-owned joint account without her consent, which admittedly she did not give.

Nevertheless, the bank persists in maintaining that its action was proper. It argues that the deletion of the name of one co-owner of a joint account is equivalent to withdrawing all the funds therefrom and opening a new account in his name alone. The bank relies on several cases also cited by the lower courts as support for this position. However, we view these cases as inapposite.

In *Sturgis v. Citizens Nat. Bank,* 152 Md. 654, 137 A. 378 (1927), Mr. Sturgis owned a savings account in his own name. He changed the account to a joint trust account with his niece, subject solely to his order, with the balance at death of either going to the survivor. Thereafter, the bank suggested that Mr. Sturgis execute another form altering the joint trust account. He complied but did not withdraw the funds and redeposit them in a new account; the change was made by an entry in the bank ledger only. The entry showed that the deposit was in trust for both, subject to the order of either, the balance at death to the survivor. No signature card was ever procured from the niece.

Upon Mr. Sturgis' death, his wife challenged the validity of the gift of the funds to the niece claiming it was essential to its validity that the depositor go through the form of withdrawing and redepositing the funds by check. The Court simply noted that the depositor had full power to change his account. Since both the depositor and the bank accepted the ledger entry as effecting the change, the parties were bound by it. As we see it, *Sturgis* is not in point. There is an obvious difference in an agreement by the bank and its depositor to add a name to an account from a situation where the bank deletes a name from an account without the consent and to the ignorance of that depositor.

In *Wetzel v. Collin,* 170 Md. 383, 185 A. 117 (1936), a joint savings account was opened by "Miss Emma Collins in trust for herself and Alice H. Collins" and was subject to the order of either person. Alice Collins sought the money in the account after the other joint owner died; however, the passbook was found with Alice Collins' name crossed off the account. This Court upheld the chancellor's ruling in favor of Alice Collins because there was no proof "that the change was made by the authority of any one having the power or authority so to do. . . ." *Id.* at 390. Because there was no indication that a change in the account was even authorized, *Wetzel* is also distinguishable from the case at bar.

Neither of these cases, in our view, is helpful to the bank. They deal with joint savings accounts where a third party is questioning the relationship between the bank and its depositors. They do not address the question of whether the bank has violated its agreement with its depositors. It seems to us that when two depositors open a joint checking account subject to withdrawal by either, each understands that at any given time the funds may be depleted by either. By the very nature of the account this risk is clear. It seems equally apparent to us that a depositor has no reason to believe that the bank at the request of one and without the consent of the other will delete his name from the account and thereby deny him the opportunity and right to withdraw funds which might, as a matter of fact, represent money that he has

deposited into the account. When the bank so favors one of its depositors, it breaches its contract with the other.

The bank argues that, in any event, the damages to which Mrs. Wright might be entitled are minimal. The short answer to this argument is that our review is limited to the propriety of the trial judge's action in granting the bank's motion for a directed verdict. The question of damages is not before us. That issue will undoubtedly surface on our remand for further consideration since in our judgment the trial court erred in granting the motion for a directed verdict.

## II

Betty Jean also argues that the bank is liable for wrongful dishonor because it refused to issue her a counter check when she sought to withdraw money from the joint account. Section 4-402 of the Commercial Law Article, Md. Code (1975), states in its opening sentence that "[a] payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." Section 4-104 (1) (g) defines item as "any *instrument* for the payment of money even though it is not negotiable but does not include money." [Emphasis supplied.] While "wrongful dishonor" is not specifically defined in Title 4, dishonor is defined in Title 3. Section 3-507 (1) provides:

(1) An *instrument* is dishonored when

(a) A necessary or optional presentment is duly made and due acceptance or payment is refused or cannot be obtained within the prescribed time or in case of bank collections the *instrument* is seasonably returned by the midnight deadline (§ 4-301); or

(b) Presentment is excused and the *instrument* is not duly accepted or paid. [Emphasis supplied.]

It seems clear to us that a dishonor occurs only when the bank fails to accept or pay an *instrument;* such dishonor is

wrongful when the bank's refusal is not justifiable pursuant to the Code or an accepted course of dealing with the customer or a recognized usage of trade. But under any circumstances, a necessary predicate for dishonor is the existence of an instrument, even where presentment is excused.

Manifestly, Betty Jean had no instrument. Her purpose in going to the bank was to procure that very thing. When the bank refused, she did not present a hand written order demanding payment from the account. The teller's refusal to issue Mrs. Wright a counter check may have constituted a breach of contract; however, the bank's action did not amount to a dishonor, right or wrong. Thus, the trial court was correct in concluding that "this is not a case of dishonor."

However, even this conclusion was gratuitous because the court answered a question that was not properly before it since Mrs. Wright failed to allege in her second amended declaration facts sufficient to raise the wrongful dishonor issue. Her declaration in Counts III and IV was directed against the bank, realleging that which was set out in Count I.[2] However, these counts merely alleged a contract claim,

---

2. Counts III and IV of Mrs. Wright's second amended declaration provide:

### COUNT III

Plaintiff herein repeats and realleges with full force and effect as is fully stated herein, each and every allegation contained in Count I hereof and in addition alleges:

That by virtue of the banking contract between Plaintiff Betty Jean Wright and Defendant Commercial & Savings Bank, Defendant Commercial & Savings Bank owed a fiduciary duty and a duty of disclosure to Plaintiff. By virtue of Defendant's removal of Plaintiff Betty Jean Wright's name from the account, and its failure to disclose the removal, Defendant breached its fiduciary and contract duties to Plaintiff and caused her grievous injury as the direct and proximate result thereof.

WHEREFORE, Plaintiff prays this Honorable Court grant judgment in her favor and award damages in the amount of One Million ($1,000,000.00) Dollars and grant such other and further relief as the nature of her cause may require.

### COUNT IV

Plaintiff restates and realleges by reference each and every allegation set out in Count I of her amended declaration with full force and effect as though fully set out herein and further alleges:

neglecting to plead any cause of action sounding in tort.[3] Therefore, she did not properly raise the wrongful dishonor issue.

Betty Jean points out that amendments to declarations shall be freely permitted and that such amendments may be "made orally in open court." *See* Md. Rule 320 d. However, this liberal treatment does not relieve a litigant of the responsibility to amend her declaration. The docket entries indicate no amendments to Mrs. Wright's second amended declaration and a thorough examination of the transcript has revealed no evidence of any amendment. Therefore, as the second amended declaration stood before the trial court, it was ineffective in raising the wrongful dishonor issue.

For the reasons previously stated, this case is reversed and remanded for further proceedings.

> *Judgment of the Court of Special Appeals reversed and case remanded to that Court to reverse the judgment of the Circuit Court for Harford County and remand to that Court for further proceedings.*
>
> *Commercial and Savings Bank to pay the costs.*

*Smith, J., dissenting:*

I dissent from Part I of the Court's opinion holding that the bank breached its contract with Mrs. Wright when it deleted her name from the account. The majority opinion does not

---

That as a direct and proximate result of the wrongful acts of Defendants, Plaintiff has suffered and will continue to suffer severe mental and physical harm and emotional distress.

WHEREFORE, Plaintiff prays this Honorable Court grant judgment in her favor and award damages in the amount of Five Hundred Thousand ($500,000.00) Dollars and grant any other and further relief as the circumstances of this case merit.

**3.** A cause of action for wrongful dishonor sounds in tort, not contract. *See* Siegman v. Equitable Trust Co., 267 Md. 309, 313, 297 A.2d 758 (1972); Boggs v. Citizens Bank & Tr. Co., 32 Md. App. 500, 501, 363 A.2d 247 (1976).

tell us that in fact the husband here gave a written order to the bank to remove his wife's name from the account. I regard that as the same as his signing a check for the sum on deposit, thus removing the money from the joint account, and then opening a new account in his individual name. The majority implies that had that procedure been followed there would be no breach on the part of the bank. I emphasize that the issue here is not whether as between the parties the husband had the right to take all the funds in the joint account but whether the bank is liable to the wife because it honored the order of the husband.

In *Wright v. Commercial & Sav. Bank,* 51 Md. App. 398, 445 A.2d 30 (1982), the Court of Special Appeals did not regard *Wetzel v. Collin,* 170 Md. 383, 185 A. 117 (1936), or *Sturgis v. Citizens Nat. Bank,* 152 Md. 654, 137 A. 378 (1927), which the majority takes pains to distinguish, as authority for its decision. It did, however, point to the fact that in *Wetzel* Judge Sloan said for this Court:

"As the entry appeared originally on the passbook and the association's ledger, the money or deposit was payable at the order of either the nominal trustee, Emma F. Wetzel, or the *cestui que trust,* Alice H. Collin. *Whalen v. Milholland,* 89 Md. 199, 43 A. 45 [(1899)]; and *Milholland v. Whalen,* 89 Md. 212, 43 A. 43 [(1899)]; *Ghingher v. Fanseen,* 166 Md. 519, 172 A. 75 [(1934)]; *Bollack v. Bollack,* 169 Md. 407, 182 A. 317 [(1935)], and the cases cited in the two last named. On these authorities there can be no doubt of the right of either trustee or *cestui que trust* to so change the account as to appropriate to her own use all the money on deposit in this account, or to transfer it from the names of both into her own name, regardless of whose money it was. On the authority of the cases just cited, if the account had been undisturbed, it would be the absolute property of the appellee by right of her survivorship. If one puts it in the power of another to so dispose of her money, the courts have no way

to protect her against the betrayal of her confidence or folly, whichever you may call it." 170 Md. at 387.

In *Wright,* after that quotation, Judge MacDaniel went on to say for the Court of Special Appeals:

"M.L.E. *Trusts,* Chap. 10, § 286 'Subsequent Deposits and Withdrawals,' commenting on the holding in *Wetzel,* said:

'Where an account is subject to the order of either party, each has [the] right so to change the account as to appropriate it to his own use or to transfer it from the names of both into his own name, and the use to which a sum withdrawn was subsequently put is of no concern to the bank.' (Footnote omitted.)

"We find further reference to the holding in *Wetzel* in [Annot.] 161 A.L.R. 71 [(1946)] (Power of one party to joint bank account to terminate the interests of the other), at page [93-94] under the subtitle 'Striking name from account.' Here A.L.R. interprets the language in *Wetzel* to mean that one joint depositor has a right to strike the name of the other joint depositor from the joint account, as this amounts to no more than a withdrawal of all the funds from the account by one of the joint depositors." 51 Md. App. at 403-04.

The majority cites no cases in support of its position. In *Wright* Judge MacDaniel went on to review for the Court of Special Appeals out-of-state cases such as *McEntire v. McEntire Ex'r,* 267 Ark. 169, 590 S.W.2d 241 (1979); *Bealert v. Mitchell,* 585 S.W.2d 417 (Ky. Ct. App. 1979); and *Hoffman v. Vetter,* 117 Ohio App. 233, 192 N.E.2d 249 (1962), which do lend some support to the decision made by the Court of Special Appeals.

In *Hoffman* the Ohio court said:

"In our consideration of the claim of Louise Vetter, with respect to the bank savings account,

we find that, when the account was established, Louise Vetter signed a blank card giving to the bank a copy of her signature; there was no formal joint account contract signed. The account then was designated on the ledger card as 'Mr. or Mrs. W. G. Vetter.' There was no withdrawal of this signature card; but after the divorce was granted, the account was changed on the ledger card at the request of Mr. Vetter to 'Wallace G. Vetter.' When Mr. Vetter remarried, the ledger card was again changed at the request of Mr. Vetter to 'Wallace G. Vetter or Mrs. Wallace G. Vetter or the survivor.' In no instance was there a formal agreement executed between the bank and the parties. The only indication that such an arrangement had been made is obtained from the typed names on the ledger card. Either party could have requested the bank to make a change in the account, and it would have been granted. The requirement that a copy of the signature be given to the bank was for the protection of the bank, not the parties to the contract." 117 Ohio App. at 234-35.

The court went on to say that after his remarriage, when the ledger sheet was made to read "Wallace G. Vetter or Mrs. Wallace G. Vetter or the survivor," the only Mrs. Wallace G. Vetter at that time was the second wife. It observed, as quoted by the Court of Special Appeals:

"When Wallace G. Vetter had his name placed on the ledger sheet, he in effect withdrew the then joint account, and made such account an individual bank account." *Id.* at 235.

As to *Bealert* the intermediate appellate court said:

"The Court of Appeals of Kentucky in *Bealert v. Mitchell,* 585 S.W.2d 417 (1979), was required to determine the ownership of five joint savings certificate accounts opened by Robert L. Erd and Allene S. Erd. Mr. Erd on April 10, 1975, had Mrs. Erd's

name removed from all joint savings accounts in their names. An officer of the saving association required Mr. Erd to present a general power of attorney and also execute an instrument document before Mrs. Erd's name was removed from the accounts. On August 14, 1975, Mr. Erd returned to the financial institution and requested that [his] name be removed from the same accounts and directed that they be placed in the name of his daughter by an earlier marriage. Although recognizing that Mrs. Erd consented to the withdrawal of her name, the Court stated at 418:

'It is our opinion that the power of attorney was not necessary because the language of the agreement between the parties clearly provided for the right to withdraw and all necessary rights directly related thereto.'

also on page 418 the Court said:

'Any interest Mrs. Erd had in the accounts was terminated by her husband when he removed her name from the accounts. This action was tantamount to a withdrawal of the funds. The record indicates that the only reason Mr. Erd did not withdraw the money from the accounts was to avoid the loss of interest and a penalty charge. We believe it is obvious that the right to withdraw encompasses the right to delete the name of another on a joint account.' "

51 Md. App. at 404-05.

The Court of Special Appeals pointed out that in *McEntire* there was a signature card for the account permitting either husband or wife to withdraw funds from an account in the sole name of the husband but that subsequently the husband caused a new signature card to be issued in his sole name, withdrawing the authority of the wife to draw funds from the account. The Arkansas court said, as quoted in part by the Court of Special Appeals:

> "Appellant implies that a withdrawal of authority, or change of authority to draw upon the account should be distinguished from a withdrawal of the funds and establishment of a new account. We have previously established that there is no such valid distinction and it was thus unnecessary for Mr. McEntire to withdraw the funds and establish a new account as opposed to the course he followed in this instance. To require such would have been superfluous and equity regards substance rather than form. *Davis v. Jackson* 232 Ark. 953, 341 SW 2nd 726." 267 Ark. at 174.

I regard the action here as the equivalent of withdrawal and establishment of a new account. Thus, I would affirm the judgment of the Court of Special Appeals.

I am authorized to state that Chief Judge Murphy and Judge Rodowsky concur in the views here expressed.